IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID H. MARION, RECEIVER for BENTLEY FINANCIAL SERVICES, INC. | : : : : : | CIVIL ACTION |
| v. | : : : | |
| HARTFORD FIRE INSURANCE CO. | : | No. 06-4666 |

MEMORANDUM OPINION

**Goldberg, J.**                                                                                                          **January 26, 2012**

Plaintiff, David H. Marion, in his capacity as receiver for Bentley Financial Services, Inc., ("BFS"), has filed suit against Defendant, Hartford Fire Insurance Co., seeking coverage under a fidelity bond. Plaintiff's claims pertain to alleged losses suffered by BFS in connection with the fraudulent activity of Robert Bentley, BFS's President and controlling shareholder. As a result of his scheme, Bentley was convicted of mail fraud and related offenses, and was subsequently sentenced to 55 months imprisonment.

Before the Court are the parties' cross motions for summary judgment and Defendant's motion for leave to amend its pleadings. Because I conclude that Plaintiff has failed to show that BFS suffered a loss within the meaning of the fidelity bond, Defendant's motion for summary judgment will be granted, and Plaintiff's cross motion for summary judgment will be denied. Defendant's motion for leave to amend will be denied as moot.

I.      **FACTUAL AND PROCEDURAL HISTORY**

Unless otherwise indicated, the facts below are undisputed.[1]

BFS is a Pennsylvania corporation established by Bentley as an investment firm specializing in the brokering of bank-issued certificates of deposit ("CDs"). (Compl. ¶¶ 13, 29.)  Generally, such investment firms are "responsible with connecting CDs available for purchase from banks with particular investors" and facilitating the purchase of CDs by investors. Marion v. TDI Inc., 591 F.3d 137, 141 (3d Cir. 2010). Bentley was the President and controlling shareholder of BFS. (Pl.'s Resp., Ex. 1 ¶ 3) ("Bentley Certification of Facts.")[2] In 1994, Bentley created Entrust Group ("Entrust"), a sole proprietorship, to act as custodian of the CDs brokered by BFS.[3] (Bentley's Certification of Facts ¶ 4; Trial Tr., May 25, 2006,

---

[1] In their cross motions for summary judgment and responses, both parties have attached evidence from the following related cases: (1) SEC v. Bentley, Civil Action No. 01-5366 (Fullam, J.); (2) United States v. Bentley, Criminal Action No. 04-779 (DuBois, J.); and (3) Marion v. TDI, Inc., Civil Action Nos. 02-7032 and 02-7076, 2006 WL 3742747 (E.D. Pa. Dec. 14, 2006) (Fullam, J.), rev'd, 591 F.3d 137 (3d Cir. 2010) (case brought by Plaintiff/Receiver against banks that allegedly aided and abetted Bentley in his scheme).  I recognize that the general rule is that evidence from other proceedings is inappropriate for consideration on a motion for summary judgment. Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009). Here, because both parties have submitted evidence from the related cases and no objections have been made to the consideration of such evidence, I will consider the evidence from the other cases, where appropriate.

[2] Exhibits that are cited more than once will be referred to by document name after the initial reference.  All trial and deposition transcripts will be cited directly, as both parties have attached transcript excerpts under different exhibit numbers.  Unless otherwise indicated, all transcripts are from Marion v. TDI, Civil Action Nos. 02-7032 and 02-7076, and all testimony is that of Robert Bentley.

[3] A CD custodian is responsible for safekeeping the paperwork received from the banks issuing the CDs, ensuring that interest payments to investors are properly made, and that the details on the issued CD match the details set forth in the contract with the investor. (Trial Tr., May 25, 2006, pp. 92-94.)  The broker is mainly responsible for ensuring that the investor does not have multiple CDs at one financial institution, and for facilitating investment transactions.

p. 90.)

From approximately June 1996 until on or about October 23, 2001, Bentley orchestrated a Ponzi scheme which "involved the sale by BFS of privately-issued, unregistered BFS notes and obligations" to numerous individual and institutional investors who believed they were purchasing bank-issued, FDIC-insured CDs.  (Bentley Certification of Facts ¶ 8.)  BFS's clients were not informed that the CDs allegedly purchased by BFS and held by Entrust were often not backed by actual CDs, but were instead unsecured BFS notes.  (Id. ¶ 10.)  In some instances, when real CDs were involved, BFS would sell the same CD to multiple investors.  (Id.)  On other occasions, BFS's clients were not informed that the CDs that they were allegedly purchasing were callable CDs, which meant that a bank could close out the CD before the stated maturity date on a client's investment contract.  This increased the risk that BFS would not be able to pay principal and interest to clients as the payments came due.  See (Trial Tr., May 25, 2006, pp. 105-108) (explaining the concept of callable CDs and how callable CDs affected BFS's ability to meet its payment obligations to its clients).

From the beginning of the scheme, the amount of BFS's liabilities exceeded the value of the assets in the underlying Entrust portfolio, and BFS's ability to meet its obligations depended on its ability to attract new investors.  (Bentley Certification of Facts ¶ 11.)  Because BFS only had liabilities, and Entrust held all the assets, BFS "had no capital or source of funds other than funds received from the BFS investors and earnings on such funds[.]"  (Id. ¶ 12); see id. ¶ 14(a) ("[T]he sole source of funds used to purchase assets in the receivership was funds of BFS investors and

earnings on those funds; the assets of the receivership estates were derived from BFS investor funds; and the receivership estates should be used to reimburse the BFS investors"). Thus, BFS had to rely on investor funds held in the Entrust accounts to pay salaries, commissions, and other expenses. (Id. ¶ 11.) By May 10, 2002, BFS's liabilities to its clients "exceeded cash, cash equivalents and CD assets held by BFS and Entrust . . . by approximately $18 million without regard to timing and present value issues[.]" (Def.'s Mot., Ex. 2 at 8.) As noted previously, this scheme ultimately resulted in Bentley's conviction for fraud.

On October 24, 2001, after the SEC filed suit against Bentley, BFS, and Entrust, Plaintiff was named as Receiver by the Honorable Jay C. Waldman. See (Pl.'s Resp., Ex. 17.) Plaintiff now seeks indemnification under a fidelity bond insuring BFS against losses resulting from employee dishonesty or fraud.[4] (Compl. ¶ 25.)

The fidelity bond in question was issued by Hartford on October 9, 1999, naming BFS and Entrust as insureds. The bond was renewed twice to extend coverage through October 9, 2004. (Compl. ¶¶ 15, 17.) Pursuant to the terms of the bond, coverage automatically terminated on October 24, 2001, upon the appointment of Plaintiff as Receiver for BFS. (Fidelity Bond, Conditions and Limitations § 12: Termination or Cancellation.) The fidelity bond provides indemnification for covered losses discovered during the bond period up to a limit of $2,000,000, less a $10,000 deductible. (Compl. ¶¶ 2, 19.)

Plaintiff submitted a proof of loss to Hartford on June 22, 2002 seeking indemnification for BFS's alleged losses in the full amount provided for in the bond, less the $10,000

---

[4] Plaintiff also seeks indemnification under Insuring Agreement (D), "Forgery or Alteration" of a negotiable instrument and a rider to the bond insuring against "Computer Systems Fraud." (Compl. ¶¶ 21, 23.)

deductible. (Compl. ¶¶ 28, 67.) The relevant provisions of the bond state:

Insuring Agreement (A) of the fidelity bond indemnifies the insured, BFS, for:

> Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others.
> Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:
> (a) to cause the Insured to sustain such loss; and
> (b) to obtain financial benefit for the Employee or another person or entity.

The bond also contains an "Ownership" provision that limits coverage to situations involving a "loss of Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) for which the Insured is legally liable."[5] The Ownership provision further states that the fidelity bond "shall be for the sole use and benefit of the Insured."

## II.   LEGAL ANALYSIS

### A.   Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears

---

[5] "Property" is defined as "Money, Certificated Securities, Negotiable Instruments, Certificates of Deposit, Documents of Title, Acceptances, Evidences of Debt, Security Agreements, Certificates of Origin or Title, Letters of Credit, insurance policies, abstracts of title, deeds and mortgages on real estate, revenue and other stamps, and books of account and other records whether recorded in writing or electronically." (Fidelity Bond, Conditions and Limitations § 1(o).)

the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record" showing a genuine issue of material fact. FED. R. CIV. P. 56(c)(1)(A). To survive a motion for summary judgment, the non-moving party must refer to specific facts in the record rather than "rely[ing] on unsupported assertions, conclusory allegations, or mere suspicions." Schaar v. Lehigh Valley Health Servs., Inc., 732 F.Supp.2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)). Evidence must be viewed in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011).

Where cross motions for summary judgment have been filed, as is the case here, the same standards apply. Lawrence v. City of Phila., 527 F.3d 299, 310 (3d Cir. 2008). "'[C]ross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified . . . .'" Id. (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)). Each motion for summary judgment must be considered separately. Williams v. Phila. Hous. Auth., 834 F.Supp. 794, 797 (E.D. Pa. 1993).

**B.     Interpretation of a Fidelity Bond**

"A fidelity bond is a contract of insurance, and the rules of interpretation of insurance policies apply." Penn Twp. v. Aetna Cas. & Sur. Co., 719 A.2d 749, 750 (Pa. Super. Ct. 1998). "The task of interpreting [an insurance] contract is generally performed by a court rather than by a jury." Regents of Mercersburg Coll. v. Republic Franklin Ins. Co., 458 F.3d 159, 171 (3d Cir. 2006) (alteration in original) (quoting Gene & Harvey Builders, Inc. v. Pa. Mfrs.' Ass'n Ins. Co., 517 A.2d 910, 913 (Pa. 1986)). When interpreting an insurance contract, the goal is to ascertain the intent of the parties as manifested by the language of the written instrument. Standard Venetian Blind Co. v. Am. Empire Ins. Co., 469 A.2d 563, 566 (Pa. 1983). "An insurance policy must be read as a whole and construed according to the plain meaning of its terms." C.H. Heist Caribe Corp. v. Am. Home Assurance Co., 640 F.2d 479, 481 (3d Cir. 1981).

**C.     Discussion**

Plaintiff bases his claim for coverage on two distinct arguments. First, he argues that BFS suffered a covered loss when Bentley sold fraudulent CDs, which created liability to the investors for payment of their principal, along with the promised rate of interest. (Pl.'s Mot. at 6-8); see also (Fidelity Bond, Conditions and Limitations § 10: Ownership) ("This bond shall apply to loss of Property (1) owned by the Insured, (2) held by the Insured in any capacity, or *(3) for which the Insured is legally liable*") (emphasis added). Second, Plaintiff claims that BFS suffered a covered loss when Bentley wrote checks to himself drawn on BFS and Entrust bank accounts. (Pl.'s Resp. at 13-14, 18.) Plaintiff urges that under either of these theories, he is entitled to the policy limit of $2 million (minus the $10,000 deductible).

More expansively, I understand Plaintiff's first theory of coverage to be as follows: Bentley represented to investors that BFS, acting as a broker, would facilitate their purchase of legitimate CDs. The investors then sent their money to Entrust (essentially, to Bentley), who misappropriated the money. Rather than receiving legitimate CDs, the investors received fake CDs, which were ultimately worthless, leaving BFS legally liable to the investors.[6] As a result of this scheme, the investors lost their principal and never received the interest they were promised. Plaintiff argues that these dishonest acts created liabilities for BFS, which are covered losses under the fidelity bond. After careful consideration, I disagree with Plaintiff's position for several reasons.

First, Plaintiff's loss theory is inconsistent with both the nature of fidelity insurance and the language of the bond. There is a fundamental difference between fidelity bonds and liability insurance: fidelity bonds are insurance contracts indemnifying against loss, not contracts that insure against liability. 11 Lee R. Russ & Thomas F. Segalla, COUCH ON INSURANCE § 160:7 (3d ed. 1997); see also West v. MacMillan, 152 A. 104, 105 (Pa. 1930). Under fidelity insurance contracts, "the insurance company does not become liable until the insured has suffered a proven loss." 11 Russ & Segalla, supra, § 160:7 (footnotes omitted). Conversely, under a liability contract, "the obligation of the insurance company becomes fixed when liability attaches to the insured." Id.; see also West, 152 A. at 105. Because of the differences in the nature of the risks covered by the two different types of policies, "liability insurance covers injuries sustained by third parties, while

---

[6] Investors typically do not receive the actual CD; rather, the custodian (here Entrust) holds the CD, and issues a "safekeeping receipt" to the investor. See Marion v. TDI Inc., 591 F.3d 137, 141 (3d Cir. 2010).

[fidelity insurance] covers first-party losses."[7]

Given the distinct difference under the law between fidelity bonds and liability insurance, in order to prove that BFS is entitled to coverage, Plaintiff must show that BFS suffered a "loss." This conclusion is entirely consistent with the language of the fidelity bond at issue, which provides coverage for "[l]oss resulting directly from" the dishonest acts of BFS employees. The bond language also emphasizes that losses suffered by BFS, not other parties, give rise to coverage. See (Fidelity Bond, Conditions and Limitations, § 5(f): Notice/Proof) ("This bond affords coverage only in favor of the Insured."); id. § 10: Ownership ("This bond shall be for the *sole use and benefit of the Insured* named in the Declarations." (emphasis added)).

Although what constitutes a "loss" is not defined in the fidelity bond, courts in this district and other jurisdictions have held that the insured must show that it suffered "an actual monetary loss." In re Amatex Corp., 97 B.R. 220, 222-23 (Bankr. E.D. Pa. 1989); accord First State Bank of Monticello v. Ohio Cas. Ins. Co., 555 F.3d 564, 569 (7th Cir. 2009) ("[A] loss is an actual depletion of bank funds[.]"); Cincinnati Ins. Co. v. Star Fin. Bank, 35 F.3d 1186, 1191 (7th Cir. 1994) (stating an insured could not recover under a bankers' blanket bond without showing "actual withdrawals

---

[7] 7A Lee R. Russ & Thomas F. Segalla, COUCH ON INSURANCE § 103:4 (3d ed. 1997); see Fireman's Fund Ins. Co. v. Special Olympics Int'l, Inc., 346 F.3d 259, 263 (1st Cir. 2003) (noting that "courts typically deem third-party losses as outside the coverage of fidelity policies"); In re Tri-State Armored Servs., Inc., 366 B.R. 326, 345 n.15 (D. N.J. 2007) ("[F]idelity bonds are not a form of third-party coverage, indemnifying the insured for its liability to third persons.") (internal quotation marks and citations omitted); Sch. Emps. Credit Union v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 839 F.Supp. 1477, 1480 (D. Kan. 1993) ("Fidelity bonds are a form of first party coverage, not a form of third party coverage indemnifying the insured from liability to third persons"); Drexel Burnham Lambert Grp., Inc. v. Vigilant Ins. Co., 595 N.Y.S.2d 999, 1007 (N.Y. Sup. Ct. 1993) ("The loss covered [by a fidelity bond] is the loss to the insured, not the losses sustained by the outside world").

of cash or other such pecuniary loss"). In short, suffering a "loss" typically means that if the property lost through employee dishonesty is not owned by the insured, the insured must expend its own funds before coverage attaches. See In re Ben Kennedy & Assocs., Inc., 40 F.3d 318, 319 (10th Cir. 1994) (holding that insured's recovery under a fidelity bond for clients' money in its possession was "limited to reimbursement of its actual out-of-pocket expense resulting from the loss of its clients' money"); 11 Russ & Segalla, supra, § 160:7 ("Loss under a fidelity policy or bond refers to actual loss, as distinguished from a theoretical or bookkeeping loss, although the bond may provide otherwise.") (footnotes omitted). Thus, "lack of any pecuniary loss by the insured from the alleged wrongful acts constitutes a good defense [for the insurer], since in such a case no recovery can be had." F.D.I.C. v. United Pac. Ins. Co, 20 F.3d 1070, 1080 (10th Cir. 1992) (quoting 13 COUCH ON INSURANCE 2d § 46:219 (1982)).

Here, the fidelity bond provides that Hartford's indemnification obligation does not attach until the "Insured" has suffered a loss. See (Fidelity Bond, Insuring Agreements § A) (referring to the "Insured's loss"). While the undisputed facts do reflect that some type of loss occurred, importantly, that loss was suffered by BFS investors, not the insured, BFS. Contractual liabilities alone, unsupported by funds sufficient to satisfy those liabilities, do not trigger coverage under the bond, as they do not represent an actual depletion of the insured's funds. BFS's "insurable interest in the loss of its clients' money while in its possession could only extend as far as the financial detriment it would suffer as a result of that loss." In re Ben Kennedy & Assocs., Inc., 40 F.3d at 319. Here, that amount is zero. Evidence of the losses suffered by third parties, "without a corresponding claim and finding of liability against the insured for that loss, is not compensable under the bond. . . . [I]f the third party fails to pursue a claim against the insured or the insured

successfully defeats the claim, the insured cannot profit from its employee's misconduct by asserting a bond claim." Massachusetts Mutual Life Ins. Co. v. Certain Underwriters at Lloyds of London, 2010 WL 2929552 at **15, 21 (Del.Ch. Jun. 22, 2010) (quoting Scott L. Schmookler, The Compensability of Third-Party Losses Under Fidelity Bonds, 7 FIDELITY L.J. 115, 140-41 (2001)).

To hold, as Plaintiff urges, that potential losses are covered could create perverse incentives. See In re Ben Kennedy & Assocs., Inc., 40 F.3d at 319-20. A broker, such as BFS, could solicit investors, lose their money, and then collect the bond proceeds (providing the other elements of coverage were satisfied). If BFS never had to make good on the investor's losses (or could settle the claims for less than the full amount), it would receive a windfall courtesy of the fidelity insurer.[8] Id. (noting that allowing the insurer to recover in this situation "would amount to allowing an insured to wager on the loss of others' property in its possession, and might foster a temptation for similarly situated insureds to 'lose' such property for economic gain").

The cases relied upon by Plaintiff for the proposition that BFS's liability to its investors is covered do not dissuade me from concluding that coverage does not apply. In First Am. State Bank v. Continental Insurance Co., 897 F.2d 319, 325 (8th Cir. 1990) (predicting Iowa law), the court does make the general statement that fidelity bonds cover "potential third party liability." However, the facts of that case reflect that the insured suffered actual losses of funds when it made loans that later had to be forgiven, and when it expended money to settle the claims against it. First Am. State Bank, 897 F.2d at 322 n.7 ("The *outflow of funds* attributed by First Bank to the funding of the

---

[8] Plaintiff also argues that BFS "held or constructively held" the money within the meaning of the bond. (Pl.'s Resp. at 19.) For the reasons set out here, it does not matter whether BFS was legally liable for the investors' funds or whether it held them. The logic is the same: BFS may not claim coverage under the bond where it has not lost or expended its own property.

fraudulent . . . loans was $945,686.73") (emphasis added); id. at 323 ("First Bank suffered a loss of $373, 308.17 through settlement as a direct result of [the dishonest employee's] acts."); id. at 324 ("First Bank proved by a preponderance of the evidence that . . . a loss under the bond of $519,415.82 was incurred, representing the total outstanding loans . . . .") (footnote omitted). First American simply does not support the proposition that fidelity coverage can lie absent a depletion of the insured's own funds.

Another case cited by Plaintiff, Graybar Electric Co. v. Federal Insurance Co., 2007 WL 1365327 (E.D. Mo. May 9, 2007), also involved an insured that had already paid settlement money, and dealt with the issue of directness, rather than whether an actual loss occurred. See id. at * 4 ("The parties have stipulated that the only issue in these motions for summary judgment is whether the loss plaintiff has suffered is a "direct loss" so that it would be covered under the policy."). Here, BFS has not expended any of its own funds to satisfy investors' claims, and thus is unable to establish a loss.

Given the differences between fidelity and liability insurance, I also decline, as Plaintiff suggests, to adopt the reasoning of In re Baker & Getty Financial Servs., 93 B.R. 559 (Bankr. N.D. Ohio 1988). In In re Baker, the employee of a brokerage firm represented to investors that they could purchase certain blocks of stock at a discount, and thereby make a substantial profit. Id. at 561. However, no such stock existed, and the employee took the investors money and converted it to his own use. Id. The court held that because the brokerage firm had "incurred an obligation" to repay the investors' funds, it had sustained a loss. Id. at 564. I disagree with the holding of Baker & Getty insofar as it concluded that a "loss" occurred at the moment the insured "incurred an obligation." That conclusion is inconsistent with the weight of the case law, and with the nature

12

of a fidelity bond, which requires coverage when there is an actual – not theoretical or potential loss.

Plaintiff's second theory of recovery is framed as one of embezzlement that resulted in a direct loss. See Fed. Deposit Ins. Corp. v. St. Paul Fire & Marine Ins. Co., 942 F.2d 1032, 1036 (6th Cir. 1991). Plaintiff alleges that a loss occurred when Bentley, in order to get money out of the scheme, transferred funds between Entrust and BFS, and wrote checks to himself from both the Entrust and BFS accounts, totaling more than $2 million. (Pl.'s Resp. at 13-14, 18.) Had BFS owned the money that Bentley stole, it may have been entitled to indemnification under this theory. Plaintiff does not, however, assert that BFS "owned" any of the funds at issue and actually noted that this issue was not "material" to this case.[9] See (Pl.'s Resp. at 11 & n.5.) Plaintiff's counsel has attempted to address this deficiency in several ways.

First, at oral argument, Plaintiff's counsel suggested that because the funds derived from Bentley's Ponzi scheme were commingled after they were received, and could not be traced back to any particular investor, they should be considered "owned" by BFS. Counsel also argued that the "ownership interest" of the investors ended when they gave money to BFS so that CDs could be purchased on their behalf. (Tr. Or. Arg., Oct. 24, 2011, pp. 12-14.) These arguments were not presented in Plaintiff's written submissions to the Court or during the first oral argument held on April 3, 2008 before the Honorable John P. Fullam, who was previously assigned this case. In any event, I fail to see how these distinctions establish that BFS "owned" the investors' money under

---

[9] While Bentley testified that BFS had $200,000 in assets of its own in 1996 (Trial Tr., May 25, 2006, p. 112), nothing in the record suggests that Plaintiff is seeking indemnification for the value of this initial net worth, nor are there any allegations that the alleged dissipation of these funds was related in any way to Bentley's fraudulent activity.

the fidelity bond. In fact, the opposite appears to be true.

BFS, as a broker, was essentially an intermediary, a conduit for the *investors'* funds. See Marion v. TDI Inc., 591 F.3d 137, 141 (3d Cir. 2010). Those funds went to Entrust as "custodian." See (Pl.'s Resp. at 4) ("Although BFS had contractual obligations, BFS did not obtain the proceeds of the sales; rather, the funds were transferred to Entrust . . . a 'fictitious custodian' used by Bentley to facilitate the Ponzi scheme"); (Trial Tr., May 25, 2006, pp. 104-05, 126, 160-61) (reflecting that Entrust was designated as "custodian," signifying that the money in CDs was "somebody else's money"). In fact, BFS "had no capital or source of funds other than funds received from the BFS investors and earnings on such funds[.]" (Id. ¶ 12); see (id. ¶ 14(a)) ("[T]he sole source of funds used to purchase assets in the receivership was funds of BFS investors and earnings on those funds . . . ."). When Bentley wanted to withdraw money from the scheme, he would generally have Entrust pay BFS in the form of a "commission so that it looked legit." (Trial Tr., May 25, 2006, p. 54.)

Plaintiff does not dispute these facts or point to additional facts supporting a finding that the money funneled through Bentley's scheme was "owned" by BFS.[10] Plaintiff's unsupported

---

[10] Indeed, in the "Proof of Loss" Plaintiff submitted to Defendant to begin the claim process under the fidelity bond, he acknowledged that the money Bentley withdrew from the scheme had no relationship to the revenue that BFS may have "earn[ed]" in connection with CD trades. See (Doc. No. 48, Ex. 2 at 5-6) ("Theoretically, a CD broker, as BFS purported to be, earns revenue by retaining a portion of the interest income to be earned over time on the CD that represents the difference between the interest rate that the issuing institution is paying on the CD and the rate that BFS agrees to pay the customer (i.e. the spread). Robert Bentley paid himself and Other BFS employees regardless of whether there was any spread involved in the transaction or the amount of the spread[]" and noting that was inappropriate because BFS and Entrust never held "sufficient funds or bank-issued CDs at any one time to satisfy all of their obligations to all of their customers"). Plaintiff does not point to any evidence regarding the "spread" that was earned by BFS or provide any argument that the purported "commissions" withdrawn from Entrust or BFS could otherwise give rise to a loss under the bond.

arguments at this stage are simply insufficient to create a triable dispute regarding the bond. While the undisputed facts reflect that Bentley caused innocent investors to lose money, which is the predictable and unfortunate result of a Ponzi scheme, these facts do not establish that BFS suffered an actual depletion of its own funds.[11] Absent such facts in the record at the summary judgment stage, Hartford is not liable to BFS.[12]

IV.     CONCLUSION

For the foregoing reasons, I conclude that as a matter of law, Plaintiff has failed to establish that BFS suffered a loss of money under the fidelity bond. Defendant's motion for summary judgment will be granted, and Plaintiff's cross motion for summary judgment denied. Therefore, Defendant's motion for leave to amend will be denied as moot.

Our Order follows.

---

[11] As noted above, Plaintiff also claims coverage under Insuring Agreement (D) and the "Computer Systems Fraud" rider. Because all of the insuring agreements at issue here contain a "loss" requirement, my conclusion that BFS did not suffer a loss within the meaning of the bond disposes of those claims as well.

[12] Had the loss of investors' money resulted in an actual loss to BFS, I would have to address whether the loss was one "resulting directly from" Bentley's dishonest acts. See (Fidelity Bond, Insuring Agreements § A.) Plaintiff correctly points out that, in Pennsylvania, "resulting directly from" is defined as losses proximately caused by the activity at issue. See Jefferson Bank v. Progressive Cas. Ins. Co., 965 F.2d 1274, 1281 (3d Cir. 1992) (observing that "Pennsylvania courts have construed 'direct cause of a loss' in the language of an insurance policy as meaning 'proximate cause of a loss'"). Because I conclude that BFS has not suffered a covered "loss" under the bond, it is unnecessary to reach the question of directness.